United States District Court
Middle District of Florida
Jacksonville Division

**DENISE DUWUAN DANIELS,**

>	*Plaintiff,*

v.	**NO. 3:23-cv-442-WWB-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

>	*Defendant.*

_____

## Report and Recommendation

Denise Duwuan Daniels challenges a final decision by the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. Doc. 1. An Administrative Law Judge (ALJ) entered the decision on February 14, 2023. Tr. 684–714. The Commissioner has filed a 1,794-page transcript, Doc. 10, Daniels has filed a brief, Doc. 15, the Commissioner has filed a response brief, Doc. 18, and Daniels has filed a reply brief, Doc. 19. Daniels argues the ALJ reversibly erred by failing to properly evaluate an opinion of Kelli Wells, M.D. Doc. 15 at 10–18; Tr. 474.

## I.	Overview

Daniels applied for disability insurance benefits on November 5, 2019, Tr. 20, 287–93, and supplemental security income the next day, Tr. 20, 303–09, alleging she had become disabled earlier that year, on July 2, 2019, Tr. 287, 303. The applications were denied at the initial level, Tr. 17–34, and the

reconsideration level, Tr. 1–6.[1] Daniels requested a hearing before an ALJ. Tr. 202–03. The ALJ conducted a hearing, at which Daniels (represented by counsel) and a vocational expert testified. Tr. 35–57. The ALJ issued an adverse decision on March 25, 2021. Tr. 17–34. Daniels requested review by the Appeals Council, Tr. 256–57, and the Appeals Council denied review, Tr. 1–6.

Daniels sued. *See Daniels v. Comm'r of Soc. Sec.*, No. 3:21-cv-1133 (M.D. Fla.). Without opposition from Daniels, the Commissioner moved for remand "for further administrative action, including offering [Daniels] an opportunity for a new hearing, further consideration of medical opinion evidence and other evidence, further consideration of [her] residual functional capacity [RFC[2]], and issuing a new decision." Doc. 23 at 1 (3:21-cv-1133). The Court granted the motion and remanded the case for that purpose. Tr. 778; Doc. 25 (3:21-cv-1133). On remand, the Appeals Council vacated the ALJ's decision, stating:

> The hearing decision does not contain an adequate evaluation of the opinion evidence. Specifically, the [ALJ] did not sufficiently articulate findings regarding the persuasiveness of the opinion from [Dr.] Wells …,

---

[1] The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. 20 C.F.R. §§ 404.900, 416.1400. Typically, a state agency acting under the Commissioner's authority makes an initial determination. *Id*. §§ 404.900, 404.1503(a), (b), 416.903(a), (b), 416.1400. If dissatisfied with the initial determination, the claimant may ask for reconsideration. *Id*. §§ 404.907, 416.1407. If dissatisfied with the reconsideration determination, the claimant may request a hearing before an ALJ. *Id*. §§ 404.929, 404.930, 416.1429, 416.1430. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. *Id*. §§ 404.967, 416.1467. If the Appeals Council denies review, the claimant may file an action in federal district court. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

[2] A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

with respect to the consistency factor as required. The ALJ discussed some of Dr. Wells' examination findings and described her opined limitations, including frequent use of upper extremities, minimal overhead work, and no writing, buttoning, zipping, unzipping, turning doorknobs, or opening bottles/cans. The ALJ then stated these restrictions are not entirely persuasive, as they appear excessive in light of the physical examination findings and imaging studies. However, the general reference to imaging studies is not sufficient to show that the ALJ considered the consistency of the opinion, as it is not clear whether this reference is to imaging studies made by Dr. Wells or other imaging studies in the record. Further, the ALJ's finding that the opinion was "not entirely persuasive" lends no clarity to what aspects of the opinion were persuasive and what aspects were not. For example, the opinion addressed upper extremity limitations, but the [RFC] did not include any such limitations. Thus, further evaluation of the opinion evidence is necessary.

Tr. 763 (internal citations omitted). The Appeals Council instructed the ALJ to:

● Give further consideration to the medical source opinion(s) pursuant to the provisions of 20 CFR [§§] 404.1520c and 416.920c.

● Give further consideration to [Daniels]'s maximum [RFC] and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR [§§] 404.1545 and 416.945 and Social Security Ruling 96-8p).

● If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on [Daniels]'s occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The [ALJ] will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR [§§] 404.1566 and 416.966). Further, before relying on the vocational expert evidence the [ALJ] will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

3

Tr. 763–64.

The ALJ conducted another hearing, at which Daniels (again represented by counsel), a vocational expert, and Allan Levine, M.D., testified. Tr. 715–60. Dr. Levine is board-certified in orthopedic surgery. Tr. 719. He reviewed the entire record. Tr. 720–23. The ALJ obtained Dr. Levine's testimony in response to the Appeals Council's order. Tr. 701, 718, 736.

## II.   ALJ's Decision

After the second hearing, the ALJ issued the decision now under review. Tr. 684–714. In the decision, the ALJ used the five-step sequential process,[3] reviewing the period from July 2, 2019 (the alleged onset date) to February 14, 2023 (the decision date).[4] *See* Tr. 687–706. The ALJ found Daniels is insured through September 30, 2019. Tr. 690.

---

[3]The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking (1) whether she is engaged in substantial gainful activity; (2) whether she has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1; (4) whether she can perform any of her past relevant work considering her RFC; and (5) whether a significant number of jobs exist in the national economy that she can perform considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If the Social Security Administration finds disability or no disability at a step, it will "not go on to the next step." *Id*. §§ 404.1520(a)(4), 416.920(a)(4).

[4]During the first hearing, Daniels amended her alleged onset date to May 25, 2018. Tr. 40–41, 724. In the decision under review, the ALJ uses the original alleged onset date. Tr. 690. Daniels does not take issue with the ALJ's use of the original onset date. *See* Doc. 15.

At step one, the ALJ found Daniels had worked after the alleged onset date but had not engaged in "substantial gainful activity"[5] since then. Tr. 690.

At step two, the ALJ found Daniels has severe impairments of "disorders of the spine and knees," "bilateral carpal tunnel syndrome" (CTS), and obesity. Tr. 690. The ALJ found Daniels has non-severe impairments of "cubital tunnel syndrome," "thyroid disorder," "migraine headaches," and "left hip disorder." Tr. 691. The ALJ explained:

> The longitudinal evidence … shows that the diagnosis of cubital tunnel syndrome was less than 12 months duration. Her complaints to treating sources are noted in the record as post the date last insured. The medical records showed she was treated with release and had no further complaints. A September 28, 2018 consultative exam include a diagnosis of a mild thyroid disorder, exam findings noted "somewhat prominent thyroid". However there is no indication from reported symptoms, conditions, or treatment of work-related limitations. A January 16, 2020, consultative exam noted no thyromegaly or bruits. She did not report complaints, limitations of functioning relating to thyroid, or related to specific medication or treatment for thyroid problems. The record also documented a medical history that included migraine headaches. She denied headaches in the September 28, 2018 consultative exam. In a January 16, 2020, consultative exam, she reported having migraines since 2017; treated with over-the-counter analgesics. Her last emergency department visit for a severe migraine was June 2019. The totality of evidence in the record shows minimal evidence of consistently reported symptom complaints, and minimal treatment. In a September 28, 2018, consultative examination, her complaints included left hip pain. She said her difficulty with sitting and standing was due to back pain. She had no difficulty with driving or shopping. Exam findings noted minimal difficulty with getting on/off the exam table, a normal gait and normal hip ranges of motion. Imaging noted minimal degenerative changes. August 10, 2022, primary care

---

[5]Substantial gainful activity is work that "[i]nvolves doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910.

exam notes said she complained of left hip pain, though the exam findings were within normal limits except as to obesity.

Tr. 691 (internal citations omitted).

At step three, the ALJ found Daniels has no impairment or combination of impairments meeting or medically equaling the severity of any listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. Tr. 691. The ALJ observed that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment[.]" Tr. 692. The ALJ explained:

> This [finding] is consistent with the testimony of the impartial medical expert, Dr. … Levine, who is board certified orthopedic surgery. Dr. Levine was asked to give his opinion related to two periods, from the date last insured, through September 30, 2019, and after the date last insured. Dr. Levine said, through September 30, 2019, [Daniels]'s medically determinable impairments established by the record were chronic neck pain, secondary to cervical degenerative disc disease, spondylosis degenerative disc disease, which is another word for arthritis of the spine. Dr. Levine noted the findings showed a 1.5 mm of herniated disc at C4-C7, which he said translates to mild spinal stenosis. She also has bilateral neuroforaminal narrowing and mild stenosis at C5-7, citing Exhibited 2F/20 and 5F/2. Dr. Levine said he was not sure of the source of her neck pain. He cited review of Exhibit 2F/20 dated June 18, 2018, and MRI cervical which documents the pathology. He said the spinal cord signal is normal, which indicates the absence of any radiographic evidence of spinal cord or neurologic deficit. He said Exhibit 6F/24 refers to a CT of cervical spine completed on May 18, 2018, which is similar to the MRI mentioned. Dr. Levine said the medical records frequently noted back pain, citing Exhibit 5F/8, in January 2020 showed unremarkable findings. He did not feel there was a back impairment, except chronic lumbo sacral strain. The next impairment was chronic left knee pain secondary to mild chondromalacia patella thinning of cartilage, this translates to mild degenerative disease of left knee. He cited Exhibit 7F/61, an MRI of left knee showed no effusion in

6

the knee. It did show a small Baker's cyst, which is mild inflammation. He cited Exhibit 9F/4, a plain x-ray, which showed minimal narrowing of medial joint, which translate into mild degenerative joint disease of left knee. He added obesity, grade 1, noting a body mass index of 30-35. Dr. Levine opined there were no impairments which met or medically equaled a listing as of the date last insured. The records do not show the need for use of cane walker or wheelchair, and no consistent evidence of neurologic deficit. He said there were functional limitations expected.

Based on the pathology and even adjusting for grade 1 obesity, she could occasionally lift 20 pounds, frequently 10 pounds; no reaching overhead to avoid cervical spine extension posture. She could carry 10 pounds occasionally and 5 pounds frequently. He said her knees come into play with regard to carrying and lifting. She could sit for 6 out of 8 hours, but no longer than 45 minutes at one time. She could stay on task if the job allowed. She could stand 2 out of 8 hours, no longer than 30 minutes at one time, and then sit 2-3 minutes. She would have to walk for one minute, as sitting in the same position adds to the knee. She could walk 1 out of 8 hours not longer than 20 minutes at a time, then sit for 2-3 minutes. She could not walk on uneven surfaces. She could stand or walk for a combined 3 of 8 hours per day. She could occasionally climb stairs, with railing, occasionally stoop but not repetitively. She should avoid ladders, scaffolds, crawling, heavy machinery, and equipment. She should avoid unprotected heights, and extreme cold. She should not be doing activity that involved repetitive twisting of the cervical spine, and occasionally reach overhead. He said prior to September 20, 2019, she had unlimited use of upper extremity except reaching overhead. She could not kneel, crouching, or crawling. She must avoid forcible grip, grasp, or torque activities with both upper extremities. Dr. Levine said he did not include balance limitations. He clarified there was nothing in the record showing the need for a hand-held assistive device. Dr. Levine confirmed the limitations continued through current date. The record does not show improvement. Dr. Levine said the 4th impairment is chronic right knee pain secondary to chondromalacia of the patella. He said he did not know date of onset of symptoms from the record; the first mention is at Exhibit 17F/46, April 5, 2022, which notes right knee pain of 1 month duration, not within DLI. Dr. Levine confirmed that he looked at and reviewed Exhibit 4F. He noted the consultative examination talked about [CTS]. His difficulty with this assessment was he did not see evidence of this until 2020. He reviewed Exhibit 5F, which concluded [Daniels] had no limitations with sitting or standing. Dr. Levine said the consultative examiners are family practitioners, not

7

specialists. He does not agree with those limitations that were assigned. He said it does not make sense, certainly not with the cervical and knee pathology. After the date last insured, the record noted a right knee impairment, it refers to [CTS], bilaterally, and minimal degenerative changes of left hip at Exhibit 13F/11. He said he did not find objective evidence of CTS. A plain x-ray of wrist showed minimal degenerative changes of small bones of wrist. Exhibit 15F/22 showed mild degenerative changes of phalangeal joints. Exhibit 13F/77, the EMG, nerve conduction study showed bilateral CTS as moderate- severe. Exhibit 13F documented operative notes of release of ulnar nerve and CTS release. Dr. Levine said there was no follow up after first surgery with several references to left doing extremely well. Dr. Levine confirmed there were no other impairments from the record. He said there were additional limitations after the date last insured. She must avoid forceful grip, grasp and torque with bilateral, that is, opening jars, use of hammer, screwdriver. This is primarily related to first tarsal and metacarpal joint. She must avoid forceful grip, torque, and pinch. She cannot do repetitive activities with hands/fingers without 1-2 minutes break. For example, working on keyboard, she must pull her hands away after 30 minutes. Dr. Levin said there was no imaging of knee prior to 2020, citing Exhibit 6F/40 October 2020, with complaints of knee pain. He cited Exhibit 9F/4, dated May 13, 2020, which showed mild spurring, minimal joint space. He said he could not expect degenerative changes to improve.

Tr. 692–93.

The ALJ found Daniels has this RFC:

to perform light work … with lifting up to 10 pounds frequently and 20 pounds occasionally; except no overhead lifting; carrying up to five pounds frequently and 10 pounds occasionally; sitting about six hours in an eight hour workday for up to 45 minutes at a time before needing to walk for 2 minutes to alleviate knee pain; standing for no more than two hours for no longer than 30 minutes at one time, then would need to sit for 3 minutes; walking 1 hour in an eight hour workday, for no more than 20 minutes, then would need to sit for 3 minutes; needs to avoid walking on uneven surfaces; no more than occasional climbing ramps/stairs, balancing, stooping; no climbing of ladders, ropes and scaffolds, kneeling, crouching, crawling; no exposure to vibration, extreme cold, unprotected heights; no repetitive twisting of the

8

neck/cervical spine; no more than occasional reaching overhead; no forceful grip or torque such as opening jars or using a screwdriver; no pinching; no repetitive manipulative activities for more than 30 minutes at one time before needing a two minute break.

Tr. 693.

The ALJ provided this background:

A November 7, 2019, Disability Report, completed by [Daniels]'s representative said conditions including back and hip problem, vision problems, migraines and high blood pressure limited [her] ability to work. Her height without shoes was noted as 5'5" and her weight was 187 pounds. She completed the eleventh grade in school and attended regular education classes. She completed specialized job training, trade, or vocational school as CNA. [She] reported stopped working July 2, 2019 because of her conditions.

Tr. 694 (internal citation omitted).

The ALJ summarized Daniels's testimony:

At the hearing [Daniels] confirmed her date of birth. She completed the 11th grade in school. She didn't graduate from high school because of family problems. She is 5'5" and weighs 188 pounds. She said she was unable to work as of the alleged onset date because of a slip and fall. She had a back and left knee injury. She said she just had an MRI and just started occupational therapy. She had 4 herniated discs in her neck, migraine headaches, high blood pressure and [CTS] for a few years that has worsened. She said she was in the cooking industry for many years. She had surgery on January 12, 2021. She said she has used a cane since May 2018. She said she is able to walk without the cane. She needs it when she gets up in the morning. The cane was not prescribed by a doctor. she worked briefly since the alleged onset date, as noted above. [She] said she supports herself with assistance from her son and daughter, and Food Stamps. She is married but does not live with her husband; they have not lived together for 10 years She said she does not live with anyone else. Since the alleged onset date, [she] said she moved into HUD housing in May 2020, prior to that she was living with her uncle. She does not have a lawsuit for the slip and fall injury. The

9

convenience store did not have insurance. [She] said she does not have a driver's license, she uses puclic transportation. In a typical day, [she] said she mostly just lies around. Her family does the household chores. Since the alleged onset date, she has used alcohol, but no illegal drugs.

Tr. 694 (internal citation omitted).

The ALJ found Daniels's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her statements about their "intensity, persistence and limiting effects … are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 694–95.

The ALJ described medical evidence from 2018:

June 18, 2018, cervical spine MRI showed central disk herniations of 1.5 mm and annular disk tears at C3/C4, C5/C6, and C6/C7 result in mild spinal canal stenosis; bilateral foramina l narrowing at C5/C6 and C6/C7 from disk degeneration and uncovertebral hypertrophy. There was no evidence of spondylolisthesis. No intrinsic spinal cord abnormalities were noted, including syrinx, myelomalacia, or demyelinating disease. Hypolordosis.

On September 28, 2018, [Daniels] presented to [Dr.] Wells … for a consultative examination. [Daniels], age 50 years, reported 4 herniated discs in her neck and some herniated discs in her back, status post slip and fall in May 2018. As to her functional status, she reported she was able to sit for short periods secondary to low back pain. She was able to stand; she was able to walk for short distances, noting frequent breaks due to back pain. She had no difficulties with cooking/meal preparation; personal care (bathing/dressing); housekeeping and laundry; shopping / banking; or driving. She reported she lived alone. On physical exam, her blood pressure was 199/111, height of 5'5", and weight of 179 pounds. She was well-groomed, alert, and oriented times 3 in no acute distress. She had no paraspinal muscle tenderness of the back, no edema, cyanosis, clubbing or swollen joints. She had 5/5 bilateral upper extremity strength, 5/5 right lower extremity strength and 4/5 left lower

10

extremity strength, and 4+/5 bilateral grip. Cranial nerves II-XII were within normal limits. Sensory was intact. She had a normal gait. Reflexes were absent at 0. She had minimal difficulty getting on and off the exam table; she used her hands to shift her body forward. She was apprehensive with walking on heels and toes, it was accomplished while holding the examiner's hand. Ranges of Motion were within normal limits, including full lumbar spine, except bilateral cervical spine forward flexion 30/50 and was 30/45 right and 20/45 left.

Tr. 695 (internal citations omitted).

The ALJ described medical evidence from 2020:

On January 16, 2020, [Daniels] presented to Elaine Holmes, M.D., who completed a consultative internal medicine examination. [She] reported a history of migraines since 2017, left sided, triggers included neck pain, with associated symptoms of nausea, vomiting, and scotomata, as well as an aura, occurring every other day. Her migraines are better with over-the-counter analgesics. Her last ER visit for a severe migraine was June 2019. [She] reports history of left anterior knee pain and giving way since 2017, worse with prolonged walking. It is better with activity modification and wearing a knee brace. She has had no history of therapeutic injections or surgeries. She denied any swelling, popping, or locking symptoms. [She] reports history of mid back pain since 2017 after a slip and fall incident. She denied any radiation of the pain to her lower extremities. [She] reports history of having hypertension in 2017. She has been off medication for over six months and reports no complications of heart attack or stroke. [She] reports history of having [CTS] bilaterally since 2000. She reports that "all" her fingers are numb. She wears a wrist splint at night. She has had no history of therapeutic injections or surgeries. [She] reports history of neck pain since 2017 after the aforementioned slip and fall. She had no prior surgeries or hospitalizations.

As to daily activities, she is able to cook once a week only due to pain on her hands. She does no cleaning or shopping. Her daughter helps out with this. [Daniels] is able to do laundry once a week, but light loads, and she can shower and dress herself daily without assistance. For leisure, she watches TV, listens to the radio, and reads. She currently does not have a primary care physician due to no insurance. She

reported a 20 years smoking history, and smoked ¼ pack per day of cigars.

On physical exam, she weighed 166 pounds, her blood pressure was 138/80. General exam findings noted she appeared in no acute distress, with normal gait. She could walk on her heels and toes without difficulty. She could only squat ½ of full due to complaints of knee pain. Her stance was normal. She did not use any assistive devices. She did not need hep changing for exam or getting on and off the exam table. she was able to rise from chair without difficulty.

Musculoskeletal findings noted no scoliosis, kyphosis, or abnormality in thoracic spine. She had tenderness to palpation on her mid thoracic spine at the T11 level, as well as tenderness on her cervical spine, midline. Straight leg raise testing negative bilaterally. There were no evident subluxations, contractures, or ankylosis. Her joints were stable and nontender. She had no redness, heat, swelling, or effusion. She did have mild thickening at the first metatarsophalangeal joint of bilateral feet, as well as some left knee crepitus. No trigger points evident. Neurologic findings noted deep tendon reflexes were physiologic and equal in upper and lower extremities. No sensory deficit noted. She had 5/5 strength in the upper and lower extremities. There was no cyanosis, clubbing, or edema of the extremities. Her pulses were physiologic and equal. No significant varicosities or trophic changes. There was no muscle atrophy noted except for mild atrophy of the left thenar muscle on her left hand. Her hand and finger dexterity were intact. Grip strengths were 5/5 bilaterally. [Daniels] is right-hand dominant. X-ray knee of the left knee were unremarkable. X-rays of the lumbosacral spine were unremarkable. Except as noted above, all other findings were within normal limits.

October 18, 2020, Shands emergency department notes said [Daniels], age 52 years, with a past medical history or hypertension presented with complaints of knee pain and swelling that persisted for 3 days. She reported swelling and pain for the past every 2-3 months. She denied fevers, chills, nausea/vomiting. The pain did not radiate. She denied back pain or decreased range of motion. Exam findings noted normal musculoskeletal range of motion. She Exhibited left knee swelling, normal range of motion, with no deformity, no erythema and normal patellar mobility. Tenderness found. Her gait was intact, slow but with normal balance. Her left knee was stiff. A left knee x-ray was negative for acute osseous, joint, or soft tissue abnormalities of the left knee. The

impression noted post-traumatic osteoarthritis of left knee, pain and swelling of left knee, and history of fall. She was discharged home, escorted by no one. The notes said wheelchair offered but declined. No distress noted.

October 27, 2020, Shands clinic notes said she complained of bilateral wrist and numbness in her fingers. She was not using wrist brace; she was wrapping her hands with ace wraps. She complained of left knee pain and swelling, with 2 years onset following a fall. The notes cited an October 19, 2020, x-ray, which showed negative for acute osseous, joint, or soft tissue abnormalities of the left knee. The history of present illness noted uncontrolled hypertension. She reported she has been out of medication for 2 years. The history of present illness also noted obesity, noting her estimated body mass index was 30.83, based on her height of 5'5" and height of 185.4 pounds. Exam findings were within normal limits except musculoskeletal tenderness and left knee swelling. The assessment noted screenings for deficiency anemia, diabetes mellitus, hyperlipidemia, and hypothyroidism. The plan noted MRI ordered for chronic pain of left knee, pain and swelling of left knee, and recurrent left knee instability. An EMG with nerve conduction study was ordered for paresthesia of hand, bilateral.

November 23, 2020, Shands electrophysiologic EMG evaluation, indicated for bilateral hand numbness revealed findings noted there was electrodiagnostic evidence of bilateral median nerve entrapment at the wrist. These were at least moderately severe lesions with evidence of acute and chronic motor axon degeneration. The entrapment on the right was more severe than the left. There was no evidence of accompanying ulnar nerve dysfunction at the wrist or elbow.

November 24, 2020, Shands clinic notes cited nerve conduction study findings which noted there was electrodiagnostic evidence of bilateral median nerve entrapment at the wrist. These are at least moderately severe lesions with evidence of acute and chronic motor axon degeneration. The entrapment on the right is more severe than the left. There was no evidence of accompanying ulnar nerve dysfunction at the wrist or elbow. The plan noted continued treatment with gabapentin and NSAIDs. A referral to occupation therapy and orthopedics was placed.

A November 29, 2020, left knee MRI, indicated for pain and swelling showed moderate joint effusion; moderate chondromalacia patella

13

without marrow edema; and small Baker's cyst. (Notably, Dr. Levine testified that it was reasonable to infer that these abnormalities as of the fall).

December 8, 2020, Shands annual gynecologic exam findings noted her blood pressure was borderline elevated; to be monitored. Her body mass index indicated obesity at 31.12. Discussion notes said education was provided. A functional status assessment noted she was independent in activities of daily living, including feeding, continence, bathing, dressing, toileting, transferring, home maintenance, cooking, laundry, telephone, finances, shopping, medications, and transport. Her ambulation status was independent, She did not have a cognitive impairment.

December 23, 2020, Shands occupational therapy notes said she was referred for bilateral [CTS]. This was visit 2/24.

Tr. 695–97 (internal citations omitted).

The ALJ described medical evidence from 2021:

A January 11, 2021, occupational therapy Discharge Summary noted visit #3. The subjective notes reflect call to [Daniels] to discuss plan of care. She stated she had received bilateral carpal tunnel injections on January 26, 2021 and had been feeling better. She did not want to continue rehabilitation at this time and was agreeable to discharge.

January 12, 2021, Shands Orthopedic new patient assessment noted bilateral [CTS]; and cubital tunnel syndrome, unspecified laterality. A left wrist x-ray showed ulnar negative variance. Normal carpal alignment. No erosion or fracture. Moderate first CMC joint osteoarthritis. A right wrist x-ray showed sclerotic density associated with the lunate bone, likely representing a bone island. There was moderate first CMC joint and mild STT joint osteoarthritis. No acute or erosion. Normal carpal alignment. Ulnar negative variance noted.

January 26, 2021, Shands Orthopedic notes included a diagnosis of bilateral [CTS] and mild trigger fingers. She reported she has been using bilateral wrist splints with improvement, not waking her up every night anymore. She received bilateral injections.

14

January 29, 2021, Shands occupation therapy discharge summary said she stated she had received bilateral carpal tunnel injections on January 26, 2021 and had been feeling better. She did not want to continue rehab at this time and was agreeable to discharge.

May 13, 2021, Baptist Medical Center emergency department notes said she presented with complaints of left knee pain. A left knee x-ray showed no abnormalities. The assessment noted contusion of left knee. She was prescribed Voltaren topical gel.

August 12, 2021, orthopedic visit notes she presented for corticosteroid injection for bilateral [CTS]. The notes said she wanted to the have CS injections again today but would like to return in the Fall to possibly schedule CTR around the holidays. The history of present illness noted her last CS injection lasted about 3 months and she could not return right then due to not have enough money for the copay until now. She has been using bilateral wrist splints (CUWS0 with improvement, not waking her up every night anymore. The active problem diagnoses list noted post-traumatic osteoarthritis of left knee; pain and swelling of left knee; history of fall; tobacco abuse; bilateral [CTS]; essential hypertension with goal blood pressure less than 140/90; and cubital tunnel syndrome. Exam findings noted full range of motion present fingers 1-5. Full and symmetric range of motion of wrist present bilaterally Grip Strength was right- 35 pounds, left 36 pounds.

August 27, 2021, Shands primary care notes said she presented for medication refill. The diagnoses list included bilateral hand paresthesia; hypertension; obesity and BMI at 32.0-32.9 and bilateral [CTS].

October 5, 2021, Shands primary care notes said she presents today with complaints of depression and anxiety. She reported she was not sleeping well and having frequent crying spells. She reported that she had several deaths in the family this year. She reported that she has never received treatment in the past for anxiety and depression. She denied suicidal or homicidal ideations. She reported that her son bought her a dog for companionship. The dog was registered as an emotional support animal registration number is 2112992061. The notes said hypertension was controlled. She was to continue with amlodipine 10mg daily. Mental status exam findings noted she was alert and oriented to person, place, and time. Mental status is at baseline. Psychiatric exam findings noted normal mood and affect, normal behavior, normal thought content and normal judgment. The assessment and plan noted anxiety and

depression. She was prescribed paroxetine (PAXIL) 10 mg oral tablet; hydroxyzine HCl (Atarax) 25 mg oral tablet. The assessment also noted essential hypertension with goal blood pressure less than 140/90; and class 1 obesity due to excess calories with serious comorbidity and body mass index (BMI) of 31.0 to 31.9 in adult.

November 12, 2021, UF Health orthopedic notes includes an assessment of right-hand dominance with bilateral [CTS], left greater than right; left cubital tunnel syndrome. She elected to proceed with carpal tunnel release surgery.

Tr. 697–99 (internal citations omitted).

And the ALJ described the medical evidence from 2022:

On January 7, 2022, operative notes reflect she underwent carpal tunnel release surgery on left and injection on the right. The diagnoses noted left hand carpal tunnel and cubital tunnel release.

January 25, 2022, Shands ortho notes reflect follow up. The plan noted she was doing well. The notes said pain control as needed. No driving or operating machinery or alcohol consumption while taking narcotic medication.

April 5, 2022, primary care notes said she presented for chronic disease surveillance and with complaints of right knee pain and left hip pain. She denied injury or trauma. Exam findings noted general musculoskeletal tenderness, otherwise normal throughout. The assessment noted annual physical exam; essential hypertension with goal blood pressure less than 140/90 treated with prescribed medication, Amlodipine; paresthesia of hand, bilateral and chronic pain of right knee, treated with Gabapentin. The assessment noted Toradol injection discontinued for chronic pain of right knee, left hip pain. The assessment also noted obesity and bilateral [CTS].

On April 12, 2022, an x-ray of left hip showed minimal narrowing of bilateral femoral acetabular joint spaces without significant osteophytosis. Moderate to severe narrowing of symphysis pubis with peri symphyseal bony sclerosis. A right knee x-ray showed minimal patellofemoral joint space narrowing with small joint effusion. Findings noted otherwise, no significant degenerative changes.

16

April 26, 2022, UF pain management notes said she presented for initial pharmacotherapy visit. The notes said her primary pain complaint today is her hip and knee pain.

May 6, 2022, Shands orthopedic assessment noted bilateral carpal and cubital tunnel syndromes. She had successful left carpal tunnel release and cubital tunnel releases. She presented for right carpal tunnel injection and to schedule right carpal tunnel release and cubital tunnel release in July/August. The history of present illness said stated left was doing "great"! Her numbness and tingling returned from CS injection about 1 month prior. She wanted CS injection again today.

June 7, 2022, Shands pain management notes reflect follow up. She was oriented, with clear and coherent speech, no daytime somnolence. She had no difficulties maintaining balance. She was started on Celebrex last visit and reported she stopped as it increased her blood pressure. She restarted ibuprofen which does not increase blood pressure per patient, but reported it not working well. She has tried meloxicam in the past but could not recall effects. She has tried naproxen with relief and no issues with blood pressure. Cyclobenzaprine was helping to control spasms and lidocaine patches were helping to control pain in neck and back. She wanted to increase patches to 2 daily as she was cutting her current ones in half. She has been noticing increased neuropathic pain. Gabapentin was discontinued last visit as it wasn't helping and she did not report neuropathic pain, she was on a low dose. The assessment noted moderately controlled pain. She would benefit from changing to alternative NSAID and restarting gabapentin for neuropathic pain. She would need to continue to monitor blood pressure on NSAID and report any worsening blood pressure on naproxen.

August 10, 2022, primary care notes said she presented for annual physical exam. The history of present illness said she presented for chronic disease surveillance and with complaints of right knee pain and left hip pain. She denied injury or trauma. Findings noted obesity and were otherwise within normal limits throughout all areas tested including neurological, mental status, and psychiatric.

On September 6, 2022, she presented to Donald S. Freedman, M.D., for a consultative examination. She reported a history of chronic neck and back pain status post slip and fall 4 year prior She reported a history of chronic left hip pain secondary to degenerative joint disease. She reported a history of bilateral carpal tunnel wrist pain secondary to

[CTS]. She underwent carpal tunnel and cubital release surgery in January 2022 and was schedule the right done September 18, 2022. Physical exam findings noted she was well developed, and walked into the exam room without any assistive devices to help ambulate. She appeared well, no acute distress. She was able to sit and stand for portions of the exam without difficulty. She was able to rise from a seated chair with difficulty. She was able to get on and off the exam table without difficulty. As to her upper extremities, she had no pain or tenderness reported during palpation. Normal range of motion throughout the upper extremities. Muscle strength was 5/5 in right and 5/5 in left upper extremities. Grip strength was 4/5 in right and 5/5 in left hands. She had no redness, no swelling, no signs of inflammation. As to her lower extremities, tenderness was reported during palpation. She had normal range of motion throughout the lower extremities. Muscle strength was 5/5 in right and 5/5 in left lower extremities, with no redness, no swelling, no signs of inflammation. Findings noted 1+ edema left knee, 2+ edema right knee. Her spine was straight with no bony deformity. Tenderness reported during palpation. She had decreased range of motion with cervical left lateral flexion, and left rotation, otherwise normal range of motion throughout. No paravertebral spasm identified. Seated and supine straight leg raise was negative. Mental status exam findings noted she was cooperative, with adequate social skills. She maintained good eye contact. Her appearance was appropriate. She was awake, alert, and oriented to place, person, and time. Mood and affect were appropriate. She was interactive and responsive. Her speech was clear. She was able to understand and follow instructions. A Range of Motion report form noted reduced measurements as to left cervical spine lateral flexion and rotation, noting with pain, lumbar ranges were normal but noted with left sided tenderness. Bilateral knee flexion was reduced, noting with pain. All other measurements were within normal limits.

October 10, 2022, operative notes reflect she underwent right carpal tunnel and cubital tunnel release surgery. Notably, [Daniels] testified that she just started therapy, will be ordering a compression glove as recommended.

Tr. 699–700 (internal citations omitted).

18

The ALJ found the medical evidence did not support Daniels's statements about the intensity, persistence, and limiting effects of her symptoms, explaining:

> As for [Daniels]'s statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because they are not supported by the objective medical evidence. She has reported that she lives alone and primarily able to independently perform activities of daily living, though with some limitations due to pain. However, she also reported being able to drive, shop, take public transportation, cook/prepare meals, [and] do household cleaning and laundry. She said she uses a cane, but it was not prescribed, and there are no exam findings which mention the use or need of a handheld assistive device for ambulation. She has issues with bilateral grip strength, but exam findings showed 4+/5 and 5/5 grip strength, and the evidence shows she completed bilateral carpal tunnel release and cubital release, with great results noted after the left release surgery. She has issues with back pain, but objective findings were unremarkable. She complained of knee pain, which again is not supported by imaging until November 2020. She complained of neck pain and difficulty with overhead reaching and lifting, Dr. Levine's testimony said this complaint is supported by May and June 2018 imaging which showed mild degenerative changes. Thus, the [RFC] assessment herein, adequately considers [her] subjective complaints and limitations, to the extent they are supported by the objective medical evidence in the record.

Tr. 701 (internal citations omitted).

The ALJ evaluated Dr. Levine's testimony, finding it persuasive:

> I find the testimony of the medical expert, Dr. Levine persuasive in this decision, as based on his thorough review of entire record and expertise in Board Certified Orthopedic Surgery.
>
> In compliance with the Order of the Appeals Council, I asked the medical expert about the opinions of the consultative examinations from Dr. Wells at Exhibits 4F and 5F. Dr. Levine noted that 4F talks about [CTS], but he did not see evidence of treatment for this condition until 2020. The medical expert noted both sources are family practitioners

and that the assessed limitations do not make sense to him. He said the opinion at Exhibit 4F gave no explanation for sitting limitations and this assessment is not consistent with the lack of clinical abnormalities noted on the physical exam conducted by the consultative examiner (at Ex. 4F), they were not consistent with the objective medical findings in the record. Further this assessment is not consistent with the opinion at Exhibit 5F, the Disability Determination Explanations (DDE's) or the medical expert's opinion.

Tr. 701.

The ALJ evaluated Dr. Wells's opinion, finding it unpersuasive:

I considered the September 28, 2018, opinion of Dr. … Wells …, who completed a consultative examination. The assessment noted [CTS]; neck pain; left lower back pain; and mild thyromegaly. Dr. Wells recommended evaluation by primary doctor. Dr. Wells opined, based on the physical exam, [Daniels] was able to perform all physical activities of examination. Her bilateral visual acuity was preserved. There were no motor deficits of extremities, her major joints were free of inflammation and pain. Grip strength was diminished. Dr. Wells said [her] functional abilities were preserved. [She] should avoid sitting for prolonged periods. She could stand/walk without an assistive device for balancing frequently. She could lift and carry up to 10 pounds occasionally. There are restrictions on the use of upper extremities; she could not frequently write, button, zip, unzip, turn doorknobs, open bottles/cans. Minimal overhead work. Avoid lifting more than 10 pounds. At this time, there are no specific restrictions other than the prior mentioned.

I am not persuaded by the limitations assessed by Dr. Wells, as not supported by or consistent with the reported exam findings, which noted no motor deficits of extremities, her major joints are free of inflammation and pain, and grip strength is diminished bilateral of 4+/5. Similarly, there is no objective support for the limitation that [Daniels] should avoid sitting for prolonged periods, as no lumbar spine abnormalities were noted on the exam. Dr. Wells noted she could stand/walk without an assistive for balancing frequently, lift and carry up to 10 pounds occasionally. There is no objective support for this limitation, as ranges of motion were reported as normal except as to cervical spine forward flexion and reflexes were absent. However, she

20

had normal gait, normal bilateral upper extremity strength. As [she] reported she was able to cook/prepare meals, attend to personal care, drive, shop, do laundry and housekeeping without difficulty, the limitations are not subjectively supported either. The restrictions on the use of upper extremities, frequently cannot write, button, zip, unzip, turn doorknobs, open bottles/cans is not supported. The limitation on minimal overhead work is partially supported by reduced cervical range of motion. There is no indication of lifting/carrying testing, a 10 pounds limitation is not supported by the exam findings.

Tr. 701–02 (internal citation omitted).

The ALJ also evaluated Dr. Holmes's opinion and found it unpersuasive, explaining:

I also considered the opinion of Dr. ... Holmes, who completed a consultative exam on January 16, 2020. The diagnoses noted chronic tobacco use; left knee pain; migraine headaches; chronic neck pain; chronic back pain; [CTS], bilaterally; and hallux valgus, bilaterally. A Range of Motion report form noted measurements within normal limits throughout except as to cervical left rotation 60/80. Dr. Holmes opined [Daniels] had no limitations for sitting or standing. She had mild limitations for prolonged walking, climbing stairs, bending, kneeling, lifting, carrying, pushing, and pulling. She had no fine motor activity limitations of the hands.

I am not persuaded by the opinion of Dr. Holmes as consultative examiner. Her assessment of "mild" limitations is vague and thus unreliable, but also inconsistent with her reported exam findings which showed no more than cervical and thoracic spine tenderness, mild thickening of toe joints and left knee crepitus. However, findings also noted negative straight leg raise, 5/5 strength in upper and lower extremis, 5/5 grip strength, bilaterally, and normal gait.

Tr. 702 (internal citations omitted).

The ALJ evaluated Dr. Freedman's opinion and found it partially persuasive, explaining:

21

I considered the September 6, 2022, opinion of [Dr.] Freedman …, who completed a consultative examination. The impressions noted history of hypertension, uncontrolled, history of degenerative joint disease, bilateral knees and hips, history of degenerative disc disease, cervical and lumbar, history of bilateral [CTS], status post left carpal and cubital release, history of depression and anxiety, and history of migraine headaches. As no work-related or functional limitations were assessed, the opinion is partially persuasive. The diagnosed impairments are consistent with the overall evidence.

Tr. 702 (internal citation omitted).

The ALJ considered prior administrative findings and found them partially persuasive, explaining:

A December 27, 2018, Disability Determination Explanation (DDE) said [Daniels]'s severe impairments were other and unspecified arthropathies; spine disorders. Prior administrative medical findings include a January 23, 2020, medical evaluation completed by Roland Gutierrez, M.D., who opined there was insufficient evidence prior to the date last insured. As to her Title XVI claim, Dr. Gutierrez completed a physical [RFC] assessment, finding [she] could perform work at the light exertion level, with postural and environmental limitations. Dr. Gutierrez' RFC explanation noted, based on review of all the evidence, [her] symptoms and functional limitations could be attributed to the medically determinable impairments. However, the stated degree and severity was not entirely supported and consistent with the medical evidence and other evidence in the record. Evidence of record indicated allegations of back, hip and left knee issues, [CTS], vision issues, migraines, and high blood pressure. [She] admitted being able to perform self-care, prepare simple meals, and walk unassisted. Imaging showed degenerative disc disease of the cervical spine. Negative imaging of the lumbar spine and left knee. Physical exam noted gait normal without the medical need for a hand-held assistive device. Decreased range of motion at the cervical spine. Mild atrophy of the left thenar muscle. Lungs clear. Heart exam normal. Essentially normal strength, reflexes, sensation, fine and gross manipulation, and range of motion otherwise. Despite the allegation of migraines, the medical evidence in file did not mention debilitating migraines consistently. [She] did not consistently complain of migraines to treating sources. There was response to medications when taken. However, [she] did not appear to

take medications consistently nor as ongoing preventative treatment. The allegation of migraines considered and incorporated into RFC, however the severity and functional limitation was not fully consistent or supported by the history or current medical evidence in file. [She] could complete activities of daily living with some limitations but was able to complete with rest periods. In terms of [her] alleged debilitating condition, the evidence is not consistent with and does not fully support that this condition is as limiting as alleged. The above [RFC] is supported by some of [her] subjective allegations', the relatively benign objective findings, and the conservative degree of treatment [she] has received. The record as a whole does not Exhibit the types of medical treatment one would expect for a totally disabled individual. Based on review, [she] should be capable of RFC as indicated.

On May 20, 2020, at the reconsideration level of determination, State agency medical consultant Aisha Bailey, D.O., similarly a physical [RFC] assessment, finding [Daniels] could perform work at the light exertion level, with limited bilateral pushing/pulling, and with postural limitations. Specifically, she could occasionally climb ladders/ropes/scaffolds and frequently crawl. Dr. Bailey's RFC assessment cited June 18, 2018, cervical spine MRI findings and September 28, 2018 consultative exam diagnoses. Dr. Bailey opined [her] symptoms are consistent with their impairment and are incorporated with the RFC. This RFC is reduced accordingly to reflect the work capacity that is obtainable given the medically determinable impairments considering all available medical evidence in the record.

The Disability Determination Explanation also documented a May 6, 2020, claims communication with [Daniels]. In a telephone call, [she] stated she had not been seen any med treatment after physical consultative examination in January 2020. She does not have insurance. Asked about copies of emergency room papers she mentioned on her form 3441 (Disability Report). [She] stated she was referring to the emergency room visit in 2017 for a slip and fall, and an emergency room visit January 14, 2018 for high blood pressure. [She] stated she had no records pertaining to 2019-2020. She consents to consultative examination. She has her own transportation; she preferred an afternoon appointment.

On September 8, 2022, at the intimal level of determination, State agency psychological consultant James A. Brown, completed a psychiatric review technique to evaluate [Daniels]'s mental

impairments, finding there was insufficient evidence to substantiate the presence of a depressive, bipolar or related disorder under listing 12.04. Dr. Brown used the "B criteria" of the mental Listings of Impairments under 12.00, finding [her] anxiety and obsessive-compulsive disorders produced no limitation in her ability to understand, remember and apply information, no limitation in her ability to interact with others, a mild limitation in her ability to concentrate, persist or maintain pace, and a mild limitation in her ability to adapt or manage herself. Dr. Brown considered [her] reported activities of daily living in form 3373 and noted appropriate responses to question. Suggest good enough cognition and the ability to self-assess in wring. She reported she was limited by physical impediments, not mental. [She] alleged anxiety and depression. Dr. Brown opined the medical evidence in the record does not appear to support either. [She] indicated she followed instructions well. Dr. Brown noted mental status exam findings from the record were within normal limits for visits dated October 2021, June 2022, noting a Depression score of 1, and August 2022. Dr. Brown concluded, nothing in the psyche medical evidence opined any severity for mental. The evaluation noted non-severe. The DDE at the reconsideration level said no [RFC] assessment associated.

I am partially persuaded by the State agency medical consultants' light exertion [RFC] assessments, which were generally consistent with the objective medical evidence and [Daniels]'s reported activities of daily living available as of the time of review. I decline to assess a mental impairment, as none is alleged, there is minimal mental health treatment, [she] did not testify to mental limitations of functioning, and mental status exam findings in the record are generally within normal limits.

Tr. 702–04 (internal citations omitted).

About Dr. Levine's testimony, the ALJ added:

As to her physical ability, I am persuaded by the expert medical testimony of Dr. Levine, a Board Certified Orthopedic Surgeon, who had the benefit of the full review of medical evidence in the record. Additionally, Dr. Levine's opinion is supported by his thorough analysis of the objective evidence and specific references to medical evidence in the record, and explanation of assessed limitations.

24

> Based on the foregoing, I find [Daniels] has the above [RFC] assessment, which is supported by the testimony and opinion of the medical expert, Dr. Levine, whose testimony was based on the chronology and pathology of objective medical evidence in the record.

Tr. 704.

At step four, the ALJ found Daniels "is unable to perform any past relevant work," identified as a "Fast Food Services Manager." Tr. 705.

At step five, the ALJ found "there are jobs that exist in significant numbers in the national economy that [Daniels] can perform," such as "Routing Clerk," "Binder Sorter," and "Information Clerk." Tr. 705–06. Thus, the ALJ found no disability. Tr. 706.

## III.   Standard of Review

A court's review of a decision by the Commissioner is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoted authority omitted). The substantial-evidence standard applies only to factual findings. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). "The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that

the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoted authority and alterations omitted).

## IV.    Law and Analysis

Daniels argues the ALJ erred by failing to properly evaluate Dr. Wells's opinion, contending the ALJ's explanation of how the ALJ considered supportability and consistency is deficient. Doc. 15 at 10–18. She argues the failure in properly evaluating Dr. Wells's opinion resulted in an RFC unsupported by substantial evidence and harmful error. *Id.* at 17–18.

An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). An ALJ will consider: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors," including evidence that a medical source is familiar with the other evidence in the claim or understands the disability program's policies and evidentiary requirements. *Id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

The most important factors are supportability and consistency, and the ALJ must explain how she considered them. *Id.* §§ 404.1520c(a), (b), 416.920c(a), (b). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will

26

be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

Dr. Wells opined Daniels should avoid sitting for prolonged periods; can frequently stand or walk without an assistive device for balancing; can lift and carry up to 10 pounds occasionally but must avoid lifting more than 10 pounds; cannot frequently write, button, zip, unzip, turn doorknobs, or open bottles or cans; and must do minimal overhead work. Tr. 474.

Contrary to Daniels's argument, the ALJ properly evaluated Dr. Wells's opinion, including by adequately explaining how the ALJ considered supportability and consistency.

The ALJ explained she was unpersuaded by Dr. Wells's opinion because the opinion was neither supported by, nor consistent with, the examination findings. Tr. 702. The ALJ described the examination findings, including that Daniels was "well-groomed, alert, and oriented times 3 in no acute distress"; she "had no paraspinal muscle tenderness of the back, no edema, cyanosis, clubbing or swollen joints"; she "had 5/5 bilateral upper extremity strength, 5/5 right lower extremity strength and 4/5 left lower extremity strength, and 4+/5 bilateral grip"; her "[c]ranial nerves II-XII were within normal limits"; her "[s]ensory was intact"; her gait was normal; her "[r]eflexes were absent at 0"; she "had minimal difficulty getting on and off the exam table"; she "used her hands to shift her body forward"; she "was apprehensive with walking on heels

27

and toes" but accomplished that "while holding the examiner's hand"; and her ranges of motion "were within normal limits, including full lumbar spine, except bilateral cervical spine forward flexion 30/50 and was 30/45 right and 20/45 left[.]" Tr. 695. The ALJ observed that the examination findings included no findings of motor deficits of extremities and included findings of major joints free of inflammation and pain and bilateral grip strength of 4+ out of 5. Tr. 702. The ALJ explained that objective support for avoiding sitting for prolonged periods is lacking, observing that the examination revealed no lumbar spine abnormalities. Tr. 702. The ALJ explained that objective support for frequently standing or walking without an assistive device and occasionally lifting and carrying up to 10 pounds is lacking, observing Daniels had normal ranges of motion (except for the absence of cervical spine forward flexion and reflexes), a normal gait, and normal bilateral upper extremity strength, and can cook, prepare meals, attend to her personal care, drive, shop, and do laundry and housekeeping without difficulty. Tr. 702. The ALJ explained that support is lacking for the opinion that Daniels cannot frequently write, button, zip, unzip, turn doorknobs, or open bottles or cans. Tr. 702. The ALJ explained that the restriction to minimal overhead work is partially supported by Daniels' reduced cervical range of motion, Tr. 702, and included in the RFC limitations on overhead work (no overhead lifting and no more than occasional reaching overhead), Tr. 693.

The ALJ further explained that she found Dr. Levine's contrary testimony persuasive because of his "full review of medical evidence in the record," his expertise shown by his board certification in orthopedic surgery, "his thorough analysis of the objective evidence," his specific references to

medical evidence, and his explanation of assessed limitations. Tr. 701, 704. The ALJ observed that Dr. Levine opined Dr. Wells's opinion lacked support and was inconsistent with other evidence. Tr. 701.

The ALJ further explained that Dr. Wells's opinion was not consistent with Dr. Holmes's consultative examination report. Tr. 701 (*see* Tr. 478–487). The ALJ observed that Dr. Holmes had "noted … 5/5 strength in upper and lower extremis, 5/5 grip strength bilaterally, and normal gait." Tr. 702 (*see* Tr. 480–81). The ALJ observed that Dr. Holmes had opined that Daniels "had no limitations for sitting or standing. She had mild limitations for prolonged walking, climbing stairs, bending, kneeling, lifting, carrying, pushing, and pulling. She had no fine motor activity limitations of the hands[.]" Tr. 702 (quoting Tr. 481).

The ALJ further explained that Dr. Wells's opinion was not consistent with the findings of the state agency medical consultants in their Disability Determination Explanations, which the ALJ found persuasive. Tr. 701. (*see, e.g.*, Tr. 58–69, 86–98).

Through the decision, which included these explanations and a thorough review of the evidence, as excerpted above, the ALJ properly evaluated Dr. Wells's opinion, including by adequately explaining how the ALJ considered supportability and consistency.

Daniels argues that "[w]hile the ALJ employed the use of the term 'inconsistent' in her evaluation, she failed to compare Dr. Wells' opinion to any evidence outside of her examination." Doc. 15 at 13 (citing Tr. 702). Daniels

concedes, "Admittedly, the ALJ also stated the opinion [is] 'not supported by or consistent with the reported exam findings, which noted no motor deficits of extremities, her major joints are free of inflammation and pain, and grip strength is diminished bilateral of 4+/5," but argues, "[w]hile this appears to show the ALJ discussing the consistency factor, in truth the medical findings cited in this statement were all extracted from Dr. Wells' examination notes …, which made this and the daily activities comparison simply a mislabeled supportability discussion." *Id.* at 13–14 (emphasis omitted) (citing Tr. 471–74, 702). Daniels continues, "The rest of the ALJ's analysis fares no better. The ALJ appeared to find the opinion inconsistent with [Daniels]'s reported daily activities, including cooking/preparing meals, attending to personal care, driving, shopping, doing laundry and housekeeping without difficulty," but these reports were also derived from Dr. Wells's examination. *Id.* at 14 (citing Tr. 469, 702). "Apart from this," Daniels complains, "the ALJ repeatedly only cites to evidence she claimed was unsupportive, not inconsistent." *Id.* at 14 (emphasis omitted) (citing Tr. 702). "Consequently, the ALJ's evaluation of Dr. Wells' opinion contained only a supportability analysis that also partially masqueraded as a consistency analysis." *Id.* at 14. Daniels argues, "The ALJ's error is further compounded by the fact that she made the same error in her previous decision," which violates the law requiring a lower tribunal's adherence to the dictates of a remand order. *Id.* at 14–15.

Daniels's arguments are unpersuasive. As the Commissioner observes:

The ALJ explained that the September 2018 opinion of consultative examiner Dr. Wells was not consistent with the opinion of the January 2020 consultative examiner Dr. Holmes …, not consistent with the findings of the state agency medical consultants contained in the

Disability Determination Explanations, and not consistent with the opinion of medical expert Dr. Levine, who testified at the December 2, 2022, administrative hearing.

Doc. 18 at 7–8 (citing Tr. 701).

Daniels complains, "[E]ven if the ALJ found Dr. Wells' opinion inconsistent with other medical opinions of record, [s]he still failed in [her] duty to explain that conclusion. A true consistency analysis required an explanation, not simply a conclusory statement." Doc. 19 at 3 (emphasis omitted). Contrary to Daniels's position, the ALJ thoroughly explained her reasoning, including her reasoning in finding Dr. Wells's opinion mostly unpersuasive.

Daniels argues that "Dr. Wells' findings were also consistent with other evidence[.]" Doc. 15 at 16. She points to this evidence:

In October 2020, APRN Jelks found [Daniels] had tenderness and swelling of the left knee. T 552. She assessed [Daniels] to have pain and swelling of the left knee, left knee instability, and paresthesia of the bilateral hands. T 554.

In November 2020, electrophysiological testing of [Daniels]'s wrists showed evidence of bilateral median nerve entrapment at the wrist, and at least moderately severe lesions with evidence of acute and chronic motor axon degeneration. T 564. Testing also showed the entrapment on the right is more severe than the left. T 564. Imaging of [her] left knee showed moderate joint effusion, moderate chondromalacia patella without marrow edema, and a small Baker's cyst. T 597-98.

In January 2021, APRN Baird found [Daniels] had a positive Durkin's test bilaterally, and a positive Tinel's test on the left. T 661. Imaging of the wrists showed moderate first CMC joint osteoarthritis bilaterally, as well as mild STT joint osteoarthritis in the right wrist. T 661-62. She was diagnosed with bilateral [CTS], (T 655, 676-77), and [she] received arthrocentesis injections in her wrists for her [CTS]. T 670.

31

In May 2021, Dr. Lim observed left knee tenderness, swelling, and restricted range of motion. T 1002. Imaging of [Daniels]'s left knee revealed mild bony spurring of the tibial spines and minimal joint space narrowing. T 1003.

In January 2022, electrodiagnostic study showed evidence of bilateral median nerve entrapment at the wrist, including at least moderately severe lesions with evidence of acute and chronic motor axon degeneration. T 1706. Entrapment on the right was found to be more severe than the left. T 1706. In April 2022, imaging of [Daniels]'s left hip revealed moderate to severe narrowing of the symphysis pubis with peri symphyseal bony sclerosis. T 1547. Imaging of the right knee showed minimal patellofemoral joint space narrowing with a small joint effusion. T 1547. [She] also underwent surgical treatment in the form of bilateral carpal tunnel release. T 1708, 1720.

*Id*. at 16–17.

That some of Dr. Wells's findings may be consistent with some evidence does not necessitate reversal; the ALJ's persuasiveness finding is supported by substantial evidence—including Dr. Levine's expert testimony—and the Court may not reweigh the evidence or substitute its judgment for the Commissioner's judgment. *See Moore*, 405 F.3d at 1211.

Finally, Daniels argues, "The ALJ's supportability analysis was also not without error." Doc. 15 at 15. Daniels observes that "[t]he ALJ claimed Dr. Wells' opinion was unsupported by unremarkable findings concerning motor deficits, joint inflammation and pain, largely normal range of motion, normal gait, and normal upper extremity strength," and argues, "[t]he ALJ's reasoning relied upon cherry-picked evidence that largely ignored the findings from Dr. Wells that did support the opinion." *Id*. at 15 (emphasis omitted) (citing Tr. 702). Daniels emphasizes that "in addition to the unremarkable findings the ALJ noted, Dr. Wells found [Daniels] had 4/5 strength in the left lower

32

extremity, and 4+/5 grip bilaterally"; "minimal difficulty getting off an off the exam table, could walk on heels and toes but only while holding Dr. Wells' hand, and was unable to rise from a squat without assistance"; Daniels's "cervical spine exhibited 30 degrees forward flexion bilaterally, 30 degrees lateral flexion on the left, and 20 degrees lateral flexion on the right"; and "Dr. Wells assessed [CTS], neck pain, left lower back pain, and mild thyromegaly." *Id.* at 16 (citing Tr. 471, 472, 474).

As the detailed decision establishes, the ALJ did not cherry pick evidence; the ALJ explained her findings, including her findings about Dr. Wells's opinion. Again, that some of Dr. Wells's findings may support her opinion does not necessitate reversal; the ALJ's persuasiveness finding is supported by substantial evidence—including Dr. Levine's testimony—and the Court may not reweigh the evidence or substitute its judgment for the Commissioner's judgment. *See Moore*, 405 F.3d at 1211. And as the Commissioner explains, "Whether or not it might arguably be possible to arrive [at] a different interpretation of the evidence is immaterial under a substantial evidence standard." Doc. 18 at 12.

Thus, in evaluating Dr. Wells's opinion, the ALJ applied the correct legal standards, and substantial evidence supports the factual findings.

## V.   Recommendation

The undersigned recommends **affirming** the Commissioner's decision and **directing** the clerk to (1) enter judgment in favor of the Commissioner and against Daniels and (2) close the file.

## VI.    Objections and Responses

"Within 14 days after being served with a copy of [a] recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A [district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). "A party failing to object to … findings or recommendations … in a report and recommendation … waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions[.]" 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on July 30, 2024.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*